## APPEAL OF TONAWANDA POWER CO.

Docket Nos. 2889, 3870, 6506.   Submitted October 8, 1926.   Decided April 8, 1926.

> Where two corporations are consolidated under the laws relating to statutory consolidation in New York and the consolidated corporation issues its stock to the stockholders of the two old corporations, it thereby acquires the assets of such corporations, and the invested capital of the new corporation is determined by the actual cash value of the assets, tangible and intangible, at the time of the consolidation.

*Charles P. Franchot, Esq.*, for the taxpayer.
*Edward C. Lake, Esq.*, for the Commissioner.

Before GRAUPNER, TRAMMELL, and PHILLIPS.

These appeals are from determinations of deficiencies in income and profits taxes for the years 1918 to 1921, inclusive, in the respective amounts of $18,071.90, $9,841.18, $15,645.34, and $2,130.86. Only so much of the deficiencies is in controversy as arises from the exclusion by the Commissioner from the taxpayer's invested capital, for each of the years involved, of the amount of $212,746.32, carried on its books as " other intangible electrical capital."

### FINDINGS OF FACT.

The taxpayer is a corporation organized under the laws of the State of New York in the year 1899, with a capital stock of $250,000, divided into 2,500 shares of the par value of $100 each. Its principal office and place of business are at North Tonawanda, N. Y., and it is engaged in the business of producing and distributing electricity for light, heat, and power.

The taxpayer was created by the consolidation of the Tonawanda Lighting & Power Co. and the Tonawanda Cataract Power Co., two New York corporations.

The Tonawanda Lighting & Power Co. had outstanding capital stock of the par value of $150,000, divided into shares of $100 each, and a bonded indebtedness of $150,000. The Tonawanda Cataract Power Co. had outstanding capital stock in the amount of $100,000, divided into shares of the par value of $100 each. It had no bonded indebtedness. Upon the consolidation the stockholders of the two old corporations received stock in the new corporation, share for share, and the new corporation took over the assets of the two old corporations and issued to the holders of the bonds of the Tonawanda Lighting & Power Co. its own bonds in an equal amount. The assets taken over by the taxpayer were set up on its books at the same values at which they were carried on the books of the two old corporations, as follows:

TONAWANDA LIGHTING & POWER CO.

| | |
|---|---:|
| Property, franchises, etc | $300,000.00 |
| Supplies and material | 500.00 |
| Bills and accounts receivable, viz: | |
| Notes receivable | 13.80 |
| Commercial incandescent | 724.31 |
| Commercial arc | 193.96 |
| Municipal lighting | 1,517.50 |
| Sundry earnings | 197.87 |
| Unexpired insurance | 631.21 |
| F. M. Gordon, manager, cash | 300.00 |
| Cash | 5,406.73 |

The item of $300,000 included the steam plant, poles, wires, meters, transformers, a substation, and all the various assets that go to make up a public utility enterprise furnishing light and power.

TONAWANDA CATARACT POWER CO.

| | |
|---|---:|
| Property, franchises, etc | $164,579.61 |
| Preliminary expenses | 1,755.40 |
| Cataract Construction Co | 7,885.17 |
| Niagara Falls Power Co | 332.41 |
| | 174,552.59 |

The item of $164,579.61 covered a contract with the Niagara Falls Power Co. for a supply of electric power known as the "Hill contract," organization expenses, and agreement by the Niagara Falls Power Co. to assign certain franchises in the territory, and its interest in other contracts. The part thereof attributable to the "Hill contract" was $134,500.

Certain liabilities were assumed by the taxpayer so that the net book value of the assets acquired, not taking into consideration the bonded indebtedness, was $466,335.01. The taxpayer's fixed

capital account was therefore set up on its books at that amount, and there was charged against the account $250,000 of the capital stock, $150,000 of bonds, and surplus in the amount of $66,335.01. The account remained in that condition until the year 1904, all capital expenditures during the interim being charged to operating expenses. During the years 1904 to 1909, some expenditures were charged to the fixed capital account so that at January 1, 1909, it stood at $496,325.34. With the establishment of the Public Service Commission of the State of New York, and the promulgation of regulations covering a uniform system of accounting for public utilities, the taxpayer began to change and allocate its expenditures for capital improvements in accordance with the uniform system so established, but did not until the year 1917 attempt to split up and allocate the amount of $496,325.34 which represented its capital account at January 1, 1909.

The steam plant acquired by the taxpayer from the Tonawanda Lighting & Power Co. was operated by the taxpayer for a short time after the consolidation and was then abandoned and sold. The taxpayer had no intention of continuing the use of the steam plant. It was necessary to operate it until the hydro-electric power was functioning properly and it was the intention to abandon it as soon as possible. The record does not disclose either the original cost of the steam plant or the amount for which it was sold.

The contract or lease known as the "Hill contract" acquired by the taxpayer from the Tonawanda Cataract Power Co. was secured by the latter company by assignment from Charles B. Hill for all of its capital stock, which, as above stated, was of the par value of $100,000.

The Hill contract was entered into by Charles B. Hill and the Niagara Falls Power Co. on June 1, 1898, and it provided, among other things, that—

* * * the Niagara Falls Power Company has leased, and hereby does lease to Charles B. Hill, or his assigns, 10,000 electrical horse-power to be generated by the turbines of the Niagara Company in and at its Power House situated upon Lots eleven (11) and twelve (12) of the Stedman Farm, situate at Niagara Falls aforesaid, driving dynamos of like unit, generating electrical horse-power for transformation and transmission to the City of North Tonawanda, in the amounts as called for, in blocks of not less than two hundred (200) electrical horse-power each, one thousand (1,000) electrical horse-power of said amount to be delivered by the Niagara Company and taken by the party of the second part, or his assigns, on or before December 1, 1898; and easement in gross in and issuing out of all said property of the Niagara Company for the protection and preservation of this lease of the said electrical power being intended to be and being hereby granted to the party of the second part, or his assigns, for and during the term of this lease; and a right to it and him to enter upon and to make use of such property to the

extent necessary to perform this agreement whenever and in case Niagara Company refuse or neglect to perform the same.

The contract also provided that it should continue in force during the corporate existence of the Niagara Falls Power Co.

On March 6, 1899, Charles B. Hill assigned to the Tonawanda Cataract Power Co. the contract mentioned, and the assignment was confirmed by the Niagara Falls Power Co. In connection with the confirmation of the assignment, the Niagara Falls Power Co. required the Tonawanda Cataract Power Co. to deliver to it, on account of power contracted for but not taken under the contract, shares of stock of the Tonawanda Lighting & Power Co. of the par value of $34,500, which the Tonawanda Cataract Co. at that time had in its treasury.

On April 1, 1907, the Tonawanda Power Co. executed an instrument releasing its rights to call upon the Niagara Falls Power Co. for electrical power in excess of 7,000 electrical horsepower and all the right of the Tonawanda Power Co. to enter upon and make use of the power plant or other property of the Niagara Falls Power Co. for the protection of its rights to power under the contract of March 6, 1899. On May 1, 1911, the contract of April 1, 1907, was rescinded and the Tonawanda Power Co. was revested with all its rights as originally conferred under the " Hill contract." Under the agreement of May 1, 1911, the taxpayer was obligated to pay the Niagara Falls Power Co. an extra 50 cents per electrical horsepower per year for all power received subsequent to April 1, 1907. On June 28, 1917, the contract of May 1, 1911, was amended so as to release the Niagara Falls Power Co. from the easement provided in the original " Hill contract."

In the year 1917, the taxpayer employed a firm of accountants, who were specialists in public utility accounting, to make a reallocation of the various items of the taxpayer's property. They estimated the cost of construction of all physical property then owned by the taxpayer and such cost was allocated on the taxpayer's books. The total cost so determined was deducted from the taxpayer's fixed capital account as it stood before the reallocation, and the difference, amounting to $212,746.32, was carried into an account known as " Other intangible electrical capital," and considered as representing the cost to the taxpayer of the " Hill contract " and the steam plant heretofore mentioned.

The Commissioner, upon audit of the taxpayer's income and profits-tax returns for the years 1918 and 1921, inclusive, excluded from invested capital for each year the amount of $212,746.32, carried in the capital account under the heading of " Other intangible electrical capital," and determined that there are deficiencies in tax in the

amounts of $18,071.90 for the year 1918, $9,841.18 for the year 1919, $15,645.34 for the year 1920, and $2,130.86 for the year 1921.

OPINION.

TRAMMELL: The only question presented by the record in this appeal is the amount, if any, that the taxpayer is entitled to include in its invested capital for the years 1918 to 1921, inclusive, on account of the item of $212,746.32, designated on its books as "Other intangible electrical capital." The taxpayer contends that if the item is to be segregated $134,500 of the amount represents the cost to it of the "Hill contract" acquired from the Tonawanda Cataract Power Co. and that the remainder of the item, to wit, $64,246.32, should be considered as the cost to it of the steam plant acquired from the Tonawanda Lighting & Power Co. One witness considered the "steam plant" as an element in the cost of distribution system and franchises of the Tonawanda Lighting & Power Co. and another considered it as an additional cost attributable to the "Hill contract." It was contended that under either theory the entire amount is properly a part of its invested capital. ·

The Board will take judicial notice of the statutes of New York under which the taxpayer corporation was organized. Under the statute in effect at the time of the statutory consolidation of the corporations, all the rights, privileges, franchises, and interests of every kind belonging to or enjoyed by the corporations consolidated, and every kind of property, real, personal, and mixed, are deemed to be transferred and vested in the new corporation without any other deed or transfer.

The effect of these statutory provisions is that the new corporation acquired assets for stock on its organization. It then becomes necessary to determine the actual cash value of the assets in question and whether they, or any of them, were tangible or intangible.

Two questions arise in the determination of the invested capital with respect to the "Hill contract" and the steam plant: First, what was their actual cash value at the time received in exchange for stock; and second, whether either or both of the above items were tangible or intangible. If intangible, the amount to be included in invested capital is limited by section 326 (a) (4) of the Revenue Act of 1918.

There is no evidence as to the value of the steam plant further than that it was abandoned soon after it was taken over. It could not be used in competition with hydraulic power and was not intended to be used for a longer time than was necessary to get the plant into operation under the power contract. The taxpayer contended that the cost of the steam plant should be considered as

104881—27——79

additional cost attributable to the acquisition of the " Hill contract." We do not think this contention is well founded, but if correct it would not establish the value of the steam plant. The " Hill contract " was acquired from one corporation and the steam plant from another, and there is nothing to indicate that the taxpayer was required to purchase the steam plant in order to acquire the " Hill contract." It might be more logically contended that the cost of the steam plant represented additional cost attributable to the acquisition of the distribution system of the Tonawanda Lighting & Power Co. But, as stated above, we are here concerned with values and not cost, and we have no evidence of value when the asset was acquired. We have no evidence that the distribution system acquired, even considering the steam plant as inseparably connected with it, was worth in excess of the values allowed by the Commissioner. Even if the steam plant were shown to have had a value when acquired, it should have been charged off against earned surplus when it was abandoned.

With reference to the " Hill contract," the evidence shows that it was acquired by the Tonawanda Cataract Power Co. in exchange for its capital stock of the par value of $100,000. The Tonawanda Cataract Power Co. also was required to pay to the Niagara Falls Power Co., when the assignment of the contract by Hill was confirmed by that company, stock of another company of the par value of $34,500, on account of power that had been contracted for but not taken. Thereafter the contract was carried on the books of the Tonawanda Cataract Power Co. at $134,500, and when taken over by the taxpayer was set up on its books at that figure.

We have then one company with a distribution system but without a power contract to enable it to obtain electric power at such a cost as to enable it profitably to furnish power to its customers, it having only a steam plant, and we have another company with a power contract by which it could secure electric energy produced by hydraulic power at a price less than it could be produced by steam, but without a distribution system.

We have in the record the testimony of persons familiar with conditions at the time and place and who were qualified by training and experience to testify as to values of such a contract as the " Hill contract " was. The actual intrinsic value is shown by the saving that could be made by obtaining power under it as compared with the cost of generating power by the steam plant. The steam plant could not be operated in competition with hydraulic power.

We have also the evidence of subsequent events supporting the testimony of the witness above referred to. There was testimony to the effect that a similar contract could have been obtained by any

reputable person or company of financial responsibility without cost; yet others could not have obtained it for this particular territory when it once was entered into. It is not unusual that valuable exclusive franchises are obtained without consideration, yet, when obtained, can be sold by the grantee or recipient for a large consideration.

From a consideration of all the evidence, we are of the opinion that the "Hill contract" had an actual cash value of $100,000 when acquired by the taxpayer.

The next question is: Was the "Hill contract" a tangible or intangible asset? It is argued by the taxpayer that it was tangible property; that it was in the nature of a lease of tangible property. With this view we do not agree. It was simply a contract to furnish electric energy to be produced in the future and was not a lease of existing tangible property. The taxpayer had the right, in case of breach of contract, to the use of the tangible property—that is, the generators and other machinery—but, in the absence of a breach, no right in or use of tangible property was involved. It was in no sense a lease of any property, and we are of the opinion that the contract referred to was intangible property and that it should be included in invested capital subject to the statutory limitation on intangibles.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*